## CONTINUATION IN SUPPORT OF
## APPLICATION FOR SEARCH WARRANT

I, Ryan McCormick, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this continuation in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple Inc. (hereafter "Apple") to disclose to the government records and other information, including the contents of communications, associated with phone number 616-915-6381 and the associated account (hereafter referred to as "**Target Account 1**"), a phone number and account utilized by Javon BRIDGEFORTH HOUSE, that are stored at premises owned, maintained, controlled, or operated by Apple, a company headquartered at 1 Infinite Loop, Cupertino, CA.  The information to be disclosed by Apple and searched by the government is described in the following paragraphs and in Attachments A and B.

2.      I am a Special Agent with the Drug Enforcement Administration ("DEA"), and have been since 2006.  During my employment with the DEA, I have been assigned to the Detroit Field Division in Detroit, Michigan and the Vienna Country Office in Vienna, Austria.

3.      I have been involved in the investigation of various individuals and organizations involved in the manufacturing, distribution, and use of controlled substances. I have conducted surveillance operations and have become familiar with the methods used by individuals engaged in the manufacturing, trafficking, and use

of controlled substances. I received specialized training at the DEA Training Academy in Quantico, Virginia in regards to the identification of narcotic substances and the operation of money laundering and drug trafficking organizations. I have written and conducted numerous search warrants which have resulted in the seizure of large amounts of narcotics and narcotics proceeds.

4.      During my employment with DEA as a Special Agent, I have also worked in an undercover capacity for the purpose of purchasing and/or receiving controlled substances; and I have participated in the preparation of affidavits in support of numerous search and arrest warrants for violations of federal drug laws contained in Title 21, United States Code, as well as in the execution of the same.

5.      I have further conducted surveillance operations of drug traffickers and have interviewed numerous persons personally involved in drug trafficking. I have also supervised numerous confidential sources during the course of carrying out drug trafficking investigations.  Through this training and experience, I have become familiar with, and have gained a thorough understanding of the methods, manner and means used by individuals engaged in the unlawful manufacturing, trafficking, and use of controlled substances.

6.      The facts in this continuation come from my personal observations, my training and experience, my review of written reports and information obtained from other agents and witnesses. This continuation is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

2

7.     Based on the facts set forth in this continuation, I submit there is probable cause to believe that violations of Title 21, United States Code, Sections 841 and 846 (Distribution and Possession with Intent to Distribute Controlled Substances, and Conspiracy to commit the same) have been committed, are being committed, and will be committed by a drug trafficking organization (the DTO) involving Anthony Martell SANDERS a/k/a "Money," "Poo," Amon Sudan SANDERS OUTLAW a/k/a "Baby Money," Javon Tyrell BRIDGEFORTH HOUSE and others. There is also probable cause to believe that the information described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

8.     On or about April 25, 2023, a grand jury indicted SANDERS, SANDERS-OUTLAW, and BRIDGEFORTH HOUSE for conspiracy to distribute controlled substances and other drug distribution and firearm charges. *See United States v. Sanders, et al.*, No. 23-cr-49 (RJJ), R.27: Indictment, PageID.96-109.

9.     Because this warrant application is being submitted for the limited purpose of establishing probable cause to search, I have not set forth every fact learned during the course of this investigation.

10.     The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

I.   IDENTIFICATION OF TARGET ACCOUNT 1

11.    On April 19, 2023, investigators received an email from Apple in response to an iCloud preservation request related to the account associated with telephone number 616-915-6381 (**Target Account 1**).   That response indicated that available data would be preserved for 90 days.  Based on my training and experience, and my conversations with other investigators involved with this investigation, I am aware that Apple's response to the preservation request would have been different had the device assigned to 616-915-6381 not been an iPhone and had the telephone number not had an iCloud account associated with it.  Therefore, I am aware that the device assigned telephone number 616-915-6381 is an iPhone and does have an associated iCloud account (**Target Account 1**).

II.   UNDERCOVER PURCHASE

A.   Introduction of the UC

12.    On or about February 2, 2023, a DEA Special Agent was contacted by a Source of Information (SOI).[1]  The SOI advised s/he was aware an individual by the name of Anthony SANDERS was involved in methamphetamine trafficking in the

---

[1] The SOI has provided information in the past, which has proven to be reliable and credible.  Specially, the SOI has provided information resulting in the seizure of narcotics and arrests.  In this instance, the SOI provided information that led to multiple successful controlled purchases of narcotics. Agents are not directing the SOI and the SOI will receive no consideration or monetary gain from information he/she provided. The SOI is aware of the information regarding SANDERS because SANDERS was interested in acquiring illegal drugs from the SOI.  The SOI has been convicted of a felony narcotics offense in the past, but wishes to avoid involvement in illegal activity and thus reported the information to law enforcement.

Grand Rapids, Michigan area.  More specifically, the SOI advised SANDERS used telephone number (616) 304-0473, (Sanders Phone 1).  Records returned from an Apple iCloud search warrant relating to Sanders Phone 1, included many photographs of SANDERS himself, and a voice identification of the male recorded using Sanders Phone 1 performed by SANDERS' United States Probation Officer further confirmed that SANDERS was indeed the user of Sanders Phone 1.

      B.    February 16, 2023 UC Buy of Approximately 1.5 Ounces of
             <u>Methamphetamine (SANDERS and BRIDGEFORTH HOUSE)</u>

13.    On February 16, 2023, a WEMET-South detective, acting in an undercover capacity (the UC), texted Sanders Phone 1 to establish contact.  The UC later called Sanders Phone 1 and spoke with SANDERS.  The UC requested to purchase two or three ounces of methamphetamine.  SANDERS replied to the UC that he did not have that much on him, but only had an ounce and a half of methamphetamine.  SANDERS informed the UC that he would sell the UC one ounce for $200.00, to which the UC agreed.  SANDERS explained that he was running low and planned to get more (methamphetamine) that evening.  SANDERS, using Sanders Phone 1, eventually called the UC back on the same date (February 16, 2023) and instructed the UC to drive to a pizzeria on Burton Street in Grand Rapids.

14.    The UC subsequently arrived at the pizzeria, parked his vehicle, and waited after advising SANDERS, over Sanders Phone 1, which vehicle he was driving.  The UC observed a male, subsequently identified as BRIDGEFORTH HOUSE, walk past the UC's vehicle before turning around and walking to the UC's

passenger side door.[2]  BRIDGEFORTH HOUSE entered the front passenger seat of the UC's vehicle.  The UC asked BRIDGEFORTH HOUSE if the price was $200.00 and BRIDGEFORTH HOUSE agreed.  BRIDGEFORTH HOUSE distributed a plastic baggie with a white crystal substance inside and the UC provided BRIDGEFORTH HOUSE $300.00 in pre-recorded buy money (the agreed upon $200 amount and an additional $100 by mistake).  BRIDGEFORTH HOUSE subsequently exited the UC vehicle and the UC pulled away from the business.

15.    After the deal, SANDERS, using Sanders Phone 1, called the UC and stated that the UC "shorted" SANDERS $100.00.  The UC told SANDERS that SANDERS agreed to $200.00 while sitting in the UC's front seat; the UC initially believed that the individual he was speaking to on Sanders Phone 1 was the person who distributed the drugs personally.  SANDERS, however, told the UC that it was not him who delivered the narcotics and that he sent someone else.  SANDERS then explained to the UC that he bought one and a half ounces which cost $300.00.  Given the additional $100 that the UC paid, the UC should have provided enough money, but SANDERS sounded adamant and demanded the UC turn around.  The UC drove back to the pizzeria and contacted SANDERS over Sanders Phone 1 to tell him that the UC was out front.  The UC observed BRIDGEFORTH HOUSE exit a barber shop in the same plaza as the pizzeria and walk to the UC's vehicle.  The UC handed BRIDGEFORTH HOUSE $100.00 in a Starbucks cup and drove away from the area,

---

[2] BRIDGEFORTH HOUSE was identified by his photograph with the Secretary of State and his Facebook profile photograph.

increasing the total to $400, $100 more than what was owed for the quantity of narcotics.

16.     The white crystal substance, provided by BRIDGEFORTH HOUSE, subsequently field tested positive for methamphetamine and weighed approximately 1.5 ounces.  Shortly after the meeting concluded, investigators observed a black Dodge Ram truck bearing Michigan license plate 2NUA18 parked in the parking lot of the strip mall which contained the pizzeria and barber shop.  The Dodge Ram is registered to a female subject believe to be related to BRIDGEFORTH HOUSE and previously used by BRIDGEFORTH HOUSE during a Kent Area Narcotics Enforcement Team (KANET)  investigation of the SANDERS DTO. Based on my training, experience, and familiarity with the investigation, I believe SANDERS, using Sanders Phone 1, directed BRIDGEFORTH HOUSE to deliver methamphetamine to a UC in Grand Rapids, Michigan on February 16, 2023.  I know that drug traffickers sometimes utilize others to deliver drugs for them to decrease the risk of law enforcement detection.

C.     February 21, 2023 UC Buy of Approximately 4 Ounces of Methamphetamine (SANDERS and BRIDGEFORTH HOUSE)

17.     On February 21, 2023, at approximately 1:00 PM, the UC contacted SANDERS at Sanders Phone 1 to arrange the purchase of four "zips" of methamphetamine.  Based on my training, experience, and familiarity with the investigation, I know that the term "zip" is a common coded reference to an ounce of illegal drugs.  SANDERS informed the UC that the price for four ounces of methamphetamine was $650.00.  The UC agreed to the purchase price and

SANDERS advised that he would be free in a couple hours.

18.    At approximately 2:00 PM on the same date (February 21, 2023), SANDERS, using Sanders Phone 1, contacted the UC via text message and stated, "you can come down now." SANDERS then gave the UC instructions to meet at "Sycamore and Sheldon," which investigators identified as the intersection of Sheldon Avenue SE and Sycamore Street SE in Grand Rapids, Michigan 49503. SANDERS, using Sanders Phone 1, subsequently texted the UC and directed him to go to "Sheldon and Buckley by the church".

19.    Investigators conducted toll analysis for Sanders Phone 1 on February 21, 2023 leading up to the buy, which further showed SANDERS connection to BRIDGEFORTH HOUSE.   Investigators learned through administrative subpoena to T-Mobile that (616) 915-6381, the phone number associated with **Target Account 1**, is subscribed to BRIDGEFORTH HOUSE. After speaking with the UC at approximately 3:14 pm, SANDERS, using Sanders Phone 1, placed an approximate 1 minute completed voice call to BRIDGEFORTH HOUSE, at (616) 915-6381 (associated with **Target Account 1**). This was approximately two minutes before the UC arrived at the buy location.

20.    On February 21, 2023, at approximately 3:16 pm, the UC located the black Dodge Ram driven by BRIDGEFORTH HOUSE.   The driver and sole occupant, identified by the UC as BRIDGEFORTH HOUSE, motioned the UC to his vehicle.   The UC walked to the Black Dodge Ram.   BRIDGEFORTH HOUSE handed the UC a clear bag, tied at the top, containing large white cloudy crystal

chunks.  The UC handed BRIDGEFORTH HOUSE $650.00 of pre-recorded funds. The UC directed BRIDGEFORTH HOUSE to count the money in front of him and BRIDGEFORTH HOUSE agreed.  At the conclusion of the transaction, the UC returned to his vehicle and left the area.  Investigators continued surveillance of BRIDGEFORTH HOUSE, in his Black Dodge Ram, as he traveled to 547 Delaware Street SE, Grand Rapids, Michigan 49507 where he parked in the driveway.  The large white cloudy crystal chunks, provided by BRIDGEFORTH HOUSE, subsequently field tested positive for methamphetamine and weighed approximately 4 ounces.

III.  SEARCH WARRANT RETURN FOR ICLOUD ASSOCIATED WITH SANDERS PHONE 1 REVEALS DRUG TRAFFICKING COMMUNICATIONS BETWEEN SANDERS AND BRIDGEFORTH HOUSE

21.    On March 13, 2023, the Honorable Phillip J. Green, United States Magistrate Judge for the Western District of Michigan, issued a warrant for information associated with the Apple ID associated to Sanders Phone 1 (616-304-0473) that was stored at premises controlled by Apple Inc. (1:23-mj-00107). Investigators subsequently received data from Apple Inc. pursuant to the warrant.

22.    During an analysis of the data received from Apple Inc. associated to Sanders Phone 1, investigators located the below photograph, which, based on the "Date Modified" of the photograph, I believe was taken on or around January 28, 2023:



Based on my training, experience, and familiarity with the investigation, I believe that the above photograph is a screenshot taken by SANDERS, the user of telephone number Sanders Phone 1.    Further, the screenshot shows a text message string with BRIDGEFORTH HOUSE, the user of telephone number 616-915-6381, the phone number associated to **Target Account 1**.  I further know that the term "zip" is common coded language by drug traffickers to refer to an ounce of a drug.  In this

text string, I believe that BRIDGEFORTH HOUSE was describing a drug transaction involving an ounce of a controlled substance.  I further believe that BRIDGEFORTH HOUSE, using telephone number 616-915-6381 (associated to **Target Account 1**) is conveying concern about law enforcement surveillance. When SANDERS responds "we all taking an [sic] risk either you with this shit or you ain't," I believe he was telling BRIDGEFORTH HOUSE that there are risks associated with drug trafficking, that they are all taking risks and that BRIDGEFORTH HOUSE should stop being nervous and/or complaining.

  23. During an analysis of the data received from Apple Inc. associated to Sanders Phone 1, investigators located the below photograph, which, based on the "Date Modified" of the photograph, I believe was taken on or around February 16, 2023:



24.     Based   on   my   training,   experience,   and   familiarity   with   the investigation,  I  believe  that  the  above  photograph  is  a  screenshot  taken  by SANDERS,  the  user  of  telephone  number  Sanders  Phone  1.    Further,  the screenshot  shows  a  text  message  string  with  BRIDGEFORTH  HOUSE,  the  user of  telephone  number  616-915-6381,  the  phone  number  associated  to  **Target Account  1**.    Near  the  bottom  of  the  photograph,  SANDERS  asked BRIDGEFORTH  HOUSE  "how  much  vezz  we  got  left?"    I  know,  based  on  my

training and experience conducting drug investigations, that drug traffickers typically use coded and/or vague language when discussing their illegal drug distribution activities over the phone, either via text message or voice call.  I also know from my training and experience that the term "vezz" is a code word for methamphetamine.  As can be seen in the above photograph, BRIDGEFORTH HOUSE, the user of 616-915-6381 (the phone number associated to **Target Account 1**) responded, "A lil over a p."  Based on my training and experience conducting drug investigations, it is my opinion the term "p" is a coded and/or vague reference to a pound quantity.  I also know that methamphetamine is typically sold in pound increments and that SANDERS has used the term "p" with the UC in the course of the investigation to reference "pound."   In summary, I believe that SANDERS saved a text message conversation with BRIDGEFORTH HOUSE, the user of telephone number 616-915-6381, in which the two individuals discussed the amount of methamphetamine remaining (a little over a pound).

25.     Additionally, during the analysis of the data received from Apple Inc. associated to Sanders Phone 1, investigators located the below photograph, which, based on the "Date Modified" of the photograph, I believe was taken on or around February 25, 2023:



26.     Based on my training, experience, and familiarity with the investigation, I believe that this photograph is another screen shot depicting a text message string between SANDERS and BRIDGEFORTH HOUSE, the user of telephone number 616-915-6381 (associated with **Target Account 1**).   In this message string, BRIDGEFORTH HOUSE, using 616-915-6381 stated, "Save them 44 grams for cus."   Further, I believe that BRIDGEFORTH HOUSE, using 616-915-6381 (associated with **Target Account 1**), requested that SANDERS save "44 grams" of an unidentified amount of illegal drugs.

14

27.    Finally, during the analysis of the data received from Apple Inc. associated to telephone number 616-304-0473, investigators located the below photograph, which, based on the "Date Modified" of the photograph, I believe was taken on or around February 16, 2023:



28.    The above photograph depicts a screenshot of a text message string with a contact saved as "D Bird Greg Ppl".  At the top of the photograph, an incoming coming text message is visible from BRIDGEFORTH HOUSE using 616-915-6381 6381 (associated with **Target Account 1**) which stated, "She acting like

the police bro".   Based on my training, experience, and familiarity with the investigation, I believe that BRIDGEFORTH HOUSE, the user of 616-915-6381 (associated with **Target Account 1**) informed SANDERS that an individual known to both users was "acting like the police," thereby causing BRIDGEFORTH HOUSE to be suspicious of the individual.  I know from my training and experience that individuals involved in the drug trade are often overly cautious of police or law enforcement scrutiny of their illegal activities.

29.    In summary, based on my training, experience, and familiarity with the investigation, I believe that BRIDGEFORTH HOUSE has used 616-915-6381, the phone number associated to **Target Account 1**, to discuss narcotics trafficking with SANDERS and possibly others.

30.    Furthermore, I believe that **Target Account 1** will contain additional evidence of that user's drug trafficking activities.  I know that Apple iCloud storage is capable of storing electronically stored information for long periods of time unless the user deletes the information.  Below, I describe the type of information maintained by Apple and its relevance to this investigation.

## Apple

31.    Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

32.    Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop

applications ("apps").  As described in further detail below, the services include email, instant messaging, and file storage:

33.    Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

34.    iMessage and FaceTime allow users of Apple devices to communicate in real-time.    iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

35.    iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services, and can also be used to store iOS device backups and data associated with third-party apps.

36.    iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device.  For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com.  iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers.    iCloud Drive can be used to store presentations, spreadsheets, and other documents.  iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices.  iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used

to create, store, and share documents, spreadsheets, and presentations.  iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.   The iCloud Backup feature enables a user to have a copy of the information on their Apple devices saved in the iCloud including iMessage, text (SMS), and MMS messages.

37.   Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

38.   Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices.  Find My Friends allows owners of Apple devices to share locations.

39.   Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

40.   App Store and iTunes Store are used to purchase and download digital content.  iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS.   Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

41.   Apple services are accessed with an "Apple ID," an account created

18

during the setup of an Apple device or through the iTunes or iCloud services.  A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

42.     An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed.  Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail).  The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

43.     Apple captures information associated with the creation and use of an Apple ID.  During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers.  The user may also provide means of payment for products offered by Apple.  The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website.  In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet

Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

44.     Additional information is captured by Apple in connection with the use of an Apple ID to access certain services.  For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website.  Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account.  Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

45.     Apple also maintains information about the devices associated with an Apple ID.  When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage.  Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number.  In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about

20

a user's web browser may be captured when used to access services through icloud.com and apple.com.  Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

46.   Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space.  That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain).   For example, **Target Account 1** may contain incriminating photographs.  Based on my training and experience, I know that drug traffickers' often take and store incriminating photographs, including, but not limited to, photographs of drugs, money, firearms, paraphernalia, or screen-grab images of communications with other drug traffickers.  Indeed, the search warrant return for the Apple iCloud account associated with Sanders Phone 1 included many incriminating photographs of drug communications amongst members of the DTO. iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups,

and other data.

47.    Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

48.    In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above.  This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

49.    For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation.  Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

50.    In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled **Target Account 1**.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and

photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time.   As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account.   Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.   In the investigation, the Apple iCloud search warrant return for Sanders Phone 1 contained self-photographs and other user attribution data for SANDERS allowing investigators to further tie that device to SANDERS.   The same could be done with **Target Account 1** and BRIDGEFORTH HOUSE.

51.   Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation.   For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information to conceal evidence from law enforcement).

52.   Other information connected to an Apple ID may lead to the discovery of additional evidence.   For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators.   In addition, emails, instant messages, Internet activity, documents, and contact and

calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

53. Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services.  In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

54. Based on my training and experience, along with the information described above, there is probable cause to believe that the iPhone connected to **Target Account 1** was used to further the crimes described above and that evidence of those crimes, including data and messages, are contained in **Target Account 1**.  In addition, in my experience, conspirators in drug trafficking utilize cellular telephones to communicate about their drug trafficking.

## AUTHORIZATION REQUEST

55. Based on the foregoing, I request that the Court issue the proposed search warrant.

56. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Apple to disclose to the government copies of the records and other information (including the content of communications and stored data) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B,

24

government-authorized persons will review that information to locate the items described in Section II of Attachment B.

57.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.